UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL NO. 19-CR-10010-MLW |
| BRIAN ORLANDELLA, | ) |
| | ) |
| Defendant | ) |

GOVERNMENT'S SENTENCING MEMORANDUM

Following a trial by jury, Defendant Brian Orlandella was convicted of one count each of Sexual Exploitation of Children, in violation of 18 U.S.C. § 2251(a) and (e), and Transfer of Obscene Material to Minors, in violation of 18 U.S.C. § 1470. For the reasons outlined below and to be articulated at the sentencing hearing, the government respectfully requests that this Court impose a sentence that includes incarceration for 329 months, which falls in the middle of the Guidelines Sentencing Range (GSR) calculated by the government. The government further recommends that the Court impose a five-year term of supervised release.

**I.   Facts**

On May 21, 2018, a local police department in Texas (the "PD") was contacted by Bridget Graham, the mother of a 13-year-old female ("Minor A"), who reported inappropriate communications between her daughter and an adult male identified as "gianninyny" on the Kik application on her mobile phone. Minor A's mother granted the PD permission to search Minor A's Kik account and phone. In so doing, the PD observed communications between Minor A and an individual utilizing the Kik username "gianninyny." Those communications, which are outlined in more detail below, included imagery sent by Minor A of her face, breasts, and genitals, and imagery sent by gianninyny depicting his penis (including imagery of him engaged in

masturbation). After photographically documenting the Kik conversation between Minor A and gianninyny that was visible on Minor A's phone (Ex. 1-1 and 1-2), the PD identified the defendant, Brian Orlandella, as the suspected user of the gianninyny account by tracing the Kik activity to the defendant's home in Beverly, Massachusetts and by comparing publicly available photographs of the defendant to some of the videos and pictures sent by gianninyny. The PD referred the case to Massachusetts, and federal agents from Homeland Security Investigations (HSI) thereafter obtained and executed a federal search warrant at the defendant's residence.

During an interview with HSI agents on the day of the search, the defendant admitted to having used Kik, that he was the adult male depicted in the profile picture for the gianninyny account, and that some of the images sent by the gianninyny account depicted his upstairs bathroom mirror. Ex. 8-2 at 4-5; Ex. 8-3 at 3, 5, 6. During the search, agents found a blue bracelet that appeared to be the same as the one worn by gianninyny in the masturbation videos and the camouflage baseball cap depicted in the gianninyny Kik profile picture. Ex. 22, 23.

Agents also seized, among other devices, two of the defendant's phones, both of which matched the make and model of the device registered to the gianninyny Kik account. Ex. 2. HSI subsequently conducted forensic analyses of both phones. Analysis revealed that there were Kik artifacts on both phones: on the newer phone (Device 1), agents observed a thumbnail version of the photograph that was gianninyny's Kik profile picture (Ex. 18-1) and a full-frontal photograph depicting the defendant standing in front of his bathroom mirror, with his face visible, his hand covering his penis, and a blue bracelet on his left wrist (Ex. 18-5, 18-6); and on the older phone

with a cracked screen (Device 2) agents observed a folder related to Kik that contained imagery of an adult male masturbating.[1]

HSI also conducted forensic analysis of Minor A's phone, during which the forensic agent, TFO Randy DeMello, located and exported the Kik conversation between Minor A and gianninyny. Ex. 21-3, 21-4, 21-5, and 21-6.[2] The export demonstrates that the defendant persuaded, induced, enticed, and coerced Minor A to engage in sexually explicit conduct, create pictures and videos of that conduct, and send it to him – or, at the very least, attempted to do so.

For example, on May 18, 2018, the defendant told Minor A to take off her shorts, that he wanted to cum, and that he wanted her to do it with him. Ex. 21-3 at 8-9. Minor A told him that she was taking a bath when she got home, and he responded: "Mmmm can u take videos for daddy?" Id. at 9. The defendant renewed his request for videos multiple times on May 19, 2018 ("U should make Daddy a video," "Make dada a video?"), Ex. 21-3 at 14, and on May 20, 2018 he initiated the following exchange:

Gianninyny:   Hi

   Wyd?

---

[1] Device 1 also contained a thumbnail version of a photograph that depicted a male masturbating on a toilet with a blue bracelet on his left wrist. Ex. 18-3. This photograph was not associated with Kik but was obviously relevant to establishing that the defendant was gianninyny.

[2] The conversation was exported and admitted at trial in two formats – one that includes certain file information about the messages (redacted at 21-5 and unredacted at 21-6) and one that appears as a visual representation of the conversation (redacted at 21-3 and unredacted at 21-4). The export included messages from May 16, 2018 through June 6, 2018, including messages that had been deleted by Minor A and sent by the PD in an undercover capacity following the transfer of the phone to PD custody and were thus not visible to the PD during its manual review of her device or included in Ex. 1-1 (redacted) and 1-2 (unredacted). It is clear from the context of the conversation that the first *recovered* chat on May 16, 2018 was not the first *actual* communication between Minor A and the defendant.

| | |
|---|---|
| Minor A: | Just got out of tub |
| Gianninyny: | Yea???? Can Daddy see? |
| Minor A: | I used my brush hehe |
| Gianninyny: | Mmmm yea? Did u make any videos? |
| Minor A: | Yeah |
| Gianninyny: | Mmmm show dada<br>Plzzzz |
| Minor A: | [Transmits 14-second video depicting a pubescent female partial submerged in water. The video appears to be taken from above, and shows the female's lower pubic area and upper thighs. The female is using her left hand to repeatedly insert the handle of a black brush into her vagina]. |

Ex. 1-1 at 17-18; Ex. 21-3 at 20-21; Ex. 21-13. Approximately a minute and a half later, Minor A sent a photograph of herself naked in a tub, with her breasts and face visible.[3] Ex. 1-1 at 19; Ex. 21-3 at 22; Ex. 21-15. When she told him the video would not send, he told her to keep trying. Ex. 1-1 at 18-19; Ex. 21-3 at 22. When the defendant asked her who he took those pictures and videos for, she told him, "No one I was waiting for you." Ex. 1-1 at 19-20; Ex. 21-3 at 23. Two minutes later, he told her to "send more" and, a minute and a half after that, "send the vids," and two and a half minutes later, "Take a pic for daddy." Ex. 1-1 at 21-23; Ex. 21-3 at 23-24.

Later that same night, they had the following exchange:

| | |
|---|---|
| Gianninyny: | Baby. Help Daddy cum |
| Minor A: | How |

---

[3] Minor A's mother identified Minor A in that image and identified the tub as being in the motel room where the family was staying the night she discovered the messages on her daughter's phone, which was the night before she gave the phone to the PD.

  Gianninyny:  I want nudes… And for u to talk like Daddy's dirty slut ok?

  Minor A:  [Transmits 14-second video depicting a pubescent female partial submerged in water. The video appears to be taken from above, and shows the female's lower pubic area and upper thighs. The female is using her left hand to repeatedly insert the handle of a black brush into her vagina].

  Gianninyny:  Mmm yes

    U already sent that tho

Ex. 1-1 at 36, Ex. 21-3 at 31-34, Ex. 21-23.  Further in the exchange, they wrote:

  Gianninyny:  Where u want Daddy's cum

  Minor A:  [Transmits image file depicting the nude genitals of a pubescent female. The photograph is extremely dark].

    In mouth

  Gianninyny:  Mmmmn

    Baby more light… And video it pussy

  Minor A:  [Transmits image file depicting the genital area of a nude pubescent female sitting on a toilet. The close-up photograph appears to be taken from above, and shows two fingers spreading open the female's genitals].

Ex. 1-1 at 38, 40, Ex. 21-3 at 34-35, Ex. 21-24, Ex. 21-26.  The exchange continued:

  Gianninyny:  Mmmmm good girl

    Such a good lil teen slut

    Make daddy a video of that tight teen cunt

  Minor A:  [Transmits 14-second video depicting the genital area of a nude pubescent female sitting on a toilet. The close-up video appears to be taken from

5

>>above, and shows the female manipulating her genitals with her left hand and inserting fingers into her vagina].

Gianninyny:   Mmmmm don't u stop

Minor A:   Sorry

Gianninyny:   Plz more

Minor A:   I had to something for my mom

Ex. 1-1 at 40-41, Ex. 21-3 at 36-37, Ex. 21-27.

During the course of these communications, the defendant sent Minor A various images and videos of his penis. Ex. 21-3 at 16, 17, 29, 35; Ex. 21-8, 21-9, 21-10, 21-18, 21-19, 21-22, 21-25. None of the depictions show his face, but in most of them he can be seen wearing a blue bracelet on what appears to be his left wrist. Id.

During the course of the six-day trial of this matter, the government called Minor A's mother, two law enforcement witnesses from the PD, HSI Special Agent Andrew Kelleher, and HSI Task Force Officer Randy DeMello to introduce the foregoing evidence. The defendant did not testify or call any witnesses on his behalf.

## II.     Sentencing Guideline Calculation

Based on its computation of the defendant's total offense level as 38 and his criminal history category as I, the United States Probation Office ("Probation") has computed a Guidelines sentence in this case to include a term of incarceration from 235 months to 293 months; the Guidelines range of supervised release is five years to life.

The government agrees with Probation's calculation of the defendant's Offense Level and Criminal History Category, except that the government believes that the adjustment for obstruction of justice should apply. See PSR ¶¶ 19-21 and Note 4, 23, and 33 and Note 5. If the Court applies the two-level enhancement, see USSG § 3C1.1, the government agrees with Probation that the

defendant's total offense level would increase to 40.  *See* PSR ¶ 33 and Note 5.  Based on his CHC (I), the resulting GSR would be 292-365.

### A. The Obstruction Enhancement

The Court should apply the obstruction enhancement here, where the record establishes by a preponderance of the evidence that the defendant committed perjury or, at least, provided materially false information to a judge.  USSG § 3C1.1, Application Note 4(B) and (F).  "Perjury consists of false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'"  *United States v. Shinderman*, 515 F.3d 5, 19 (1st Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 92-94 (1993)).  In this context, "material" information is that which, "if believed, would tend to influence or affect the issue under determination."  USSG § 3C1.1, Application Note 6.

At a March 2020 hearing on the defendant's motion to suppress statements he made to law enforcement on December 3, 2018, the government presented testimony from two federal agents and admitted recordings of the defendant's (partially) taped interview.  The defendant elected to testify on his own behalf, presented testimonial evidence from his wife, and introduced various documents.

The Court denied the motion to suppress.  Doc. 113, 170 (transcript).  In its statement of reasons for denying the motion, the Court noted: "Although I will not usually single out particular untruthful statements, I find that the defendant's affidavit and testimony were not truthful in certain respects."  Doc. 170 at 5.  The Court further explained: "I find he looked [at the *Miranda* form] carefully enough to see that the form stated on separate lines each of the *Miranda* rights with which he was familiar and included a statement that he was waiving those rights.  That's Exhibit 3.  The

defendant's testimony that he believed he was signing a consent to record form is not credible." Doc 170 at 11-12.

The Court's tempered and careful assessment of the defendant's credibility on this point is well supported by the record. First, in the affidavit submitted in support of the motions to suppress, the defendant averred, "I was not read my *Miranda* warnings by anyone. The agent slid a piece of paper to me and said words to the effect that, 'You know this stuff because of work.' He handed me a pen and nonchalantly told me to sign the paper that contained *Miranda* rights." Doc. 40, Affidavit of Brian Orlandella in Support of Motion to Suppress, ¶ 11. In fact, the recording of this exchange (Motion Exh. 2, and transcript, Motion Exh. 2A[4]) shows that Agent Kelleher *asked the defendant* how he would like the *Miranda* rights administered: "Would you like me to read this out loud or do you want to read it to yourself?" Mot. Exh. 2A at 2.[5] The defendant responded, "No, I know what it is." *Id*. The defendant's claims to the contrary under oath are simply not believable in light of his 20-year career as a probation officer. He was steadfast in that dubious claim:

> Q: In December, specifically December 3 of 2018, you knew what *Miranda* rights were, correct?
> A: No.
>
> …
>
> Q: Are you claiming that on that date you did not understand what your *Miranda* rights were?
> A: Yes.

---

[4] The recording was introduced at trial as Exhibit 7 and the transcript as Exhibit 8.

[5] Prior to this exchange, Agent Kelleher told the defendant that he was not under arrest and "you don't have to speak with us, but we do want to read you your *Miranda* rights so you understand what your rights are. So we have, we have a form that, you know I can read it to you, you can read it yourself and then, if you're so inclined, then we can sign it." Special Agent Iannaccone then left to retrieve a form. Mot. Exh. 2A at 1.

>   Q:   That's what you're claiming here today?
>   A:   Well, I'm claiming that I didn't know what my rights were because they weren't explained to me properly.

Doc. 168 (transcript of March 3, 2020 hearing) at 156.

Even when confronted with his own words on tape, the defendant refused to admit that he had informed the agents that he was familiar with his *Miranda* rights (and that he understood he was signing a *Miranda* waiver):

>   Q:   And then Andy Kelleher says, 'Would you like me to read this out loud, or do you want to read it to yourself?' What was your response, sir?
>   A:   I said, "No. I know what is is."
>   Q:   Okay. So you told him you knew what the *Miranda* form was, correct?
>   A:   No, I did not.

Doc. 168 at 160.

The form itself supports the Court's finding that the defendant's testimony on the issue was perjurious. *See* Mot. Exh. 3 / trial Exh. 9. The form lays out the *Miranda* rights in a section titled "STATEMENT OF RIGHTS" (in summary: right to remain silent, that statements can be used against him, right to attorney, that attorney may appointed, right to stop questioning at any time) and then, in a section titled "WAIVER," reads: "I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." *Id*. The defendant signed the bottom of the form after reviewing it. *Id*.; Mot. Exh. 2A at 2-3; Doc. 170 at 11.

The Court also found, in denying the defendant's motion to suppress the warrantless search of his car, that "the agents are credible on [whether they coerced the defendant's consent to search by telling him that they were getting or would get a warrant] and the defendant is not." Doc. 170 at 87. The Court further specifically found that "[t]he defendant's contention that during the first break in the taping the agents said they were in the process of getting a warrant or, as the defendant testified on March 3 at pages 145 and 154 or the draft transcript that they would get a warrant, is

9

not credible." Doc. 170 at 89-90.  The record amply supports the Court's determination of credibility here.  For example, the recording of the interview demonstrates that the defendant *offered* agents the opportunity to search his car after Agent Iannaccone asks spontaneously whether he has a car: "Yeah…do you want to go through it?"  Mot. Exh. 2A (Trial Exh. 8-2) at 10.  The defendant's testimony seemed to imply that he was not aware (or did not remember) that this exchange was caught on tape:

> Agent Iannaccone said that they were interested in looking in my car, and I asked them why.  And he said, 'You know, we're just interested in looking in there.  Would you allow us to look in there,' something to that nature.  And I believe I again asked them why, and he said that, 'It will make it a lot easier for everyone around here.  We don't want to be waiting around all day.'  And I didn't really respond to that, and he said, 'We're in the process of getting a warrant anyway.'  That's what I heard him say.  And then he went and got the keys and he came back, and he asked which keys were yours.  He held three keys.

Doc. 168 at 114.

The recording itself clearly corroborates Agent Kelleher's testimony that he did not mention anything to him about getting a warrant to search the car or say anything to him to the effect that it would be easier for him to sign a consent form than to get a warrant to search the car.  Doc. 167 (transcript of March 2, 2020 hearing) at 60-61.  Because the competing testimony on this issue was directly contradictory and mutually exclusive, and because the recording supports the agents' testimony, the Court's finding that the agents were credible and the defendant was not necessarily warrants a finding that the defendant's incredible testimony amounted to perjury.  The defendant's perjurious testimony on these points was clearly material: whether the defendant understood his *Miranda* rights and knowingly waived them and whether he was coerced into granting agents consent to search his car bore directly on the suppression issues presented to the Court.

The defendant, a 20-year veteran of the criminal justice system (see PSR ¶ 70), elected to

take the stand at the March 2020 motion hearing to further his defense.  He took an oath to tell the truth and then testified in a manner that was clearly formulated to benefit himself by misleading the Court about the circumstances surrounding his *Miranda* waiver and consent to search his car, with the aim of triggering suppression of his statements and certain evidence.  When measured against other directly contradictory evidence – not just the testimony of law enforcement agents but also the recording of the interview and the *Miranda* waiver form themselves – the defendant's testimony was clearly not truthful.  As such, the obstruction enhancement should be applied.  *United States v. Fermin*, 771 F.3d 71, 81 (1st Cir. 2014) (affirming application of obstruction enhancement, finding that Fermin's testimony was "a tale spun to attempt to get [the court] to suppress the evidence," and that it was "clearly false," both "in its specifics and … in a general overall sense"); *United States v. Cohen*, 887 F.3d 77, 89-91 (1st Cir. 2018) (affirming application of obstruction enhancement on basis of perjury where district court finding that defendant's testimony was not credible encompassed elements of perjury and the untruthful testimony was material) (citing *Fermin*).

### B.  The Defendant's Objections

The defendant lodged written objections[6] to the application of three two-level enhancements outlined in Paragraphs 28 (age of child victim, USSG § 2G2.1(b)(1)), 29 (commission of sexual act, USSG § 2G2.1(b)(2)), and 30 (use of computer, USSG § 2G2.1(b)(6)) of the PSR.  As noted above, the government agrees with Probation's application of these

---

[6]  The government expects that Probation will incorporate the objections verbatim into the Final PSR and thus addresses the objections here rather than wait for publication of the report.  If Probation's treatment of the objections invites further legal analysis or discussion from the parties, the government will file a response by the July 29, 2022 deadline (or thereafter, with the Court's permission).

enhancements based on the specific offense characteristics addressed in each one. The defendant offers no authority in support of his objections, and his unsupported claims are, in some instances, plainly wrong.

For example, the defendant bases his objection to PSR ¶ 28 on an assertion that the age of the child is already included as an element of the offense. This is not entirely accurate. The government must prove that the victim is a minor – a child under 18. *See* Doc. 268 at 86. The Guideline assigns enhancements based on the *particular* age of a victim – four levels for those under 12 and two levels for those under 14. The victim[7] here was 13 years old. Application of this enhancement is thus appropriate. *See, e.g.*, *United States v. Gonyer*, 761 F.3d 157, 165 (1st Cir. 2014) (application proper where grooming of victim started before he turned 16).

The defendant's objection to PSR ¶ 29 is similarly baseless. First, the defendant was convicted of employing, using, persuading, inducing, enticing, or coercing Minor A to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing that the visual depiction would be transmitted in interstate commerce (or attempting to do so). 18 U.S.C. § 2251(a); Doc. 15; Doc. 258. USSG § 2G2.1(b)(2) assigns a two-level enhancement when, as here, the offense involves the commission of a sexual act or sexual contact. As Probation notes, the offense involved the production of imagery showing Minor A inserting a brush into her vagina and manipulating her genitals. Application of this enhancement is thus appropriate. *United States v. Raiburn*, 20 F.4th 416, 422-424 (8th Cir. 2021) (joining Second, Third, Sixth, and Eleventh Circuits in finding that "sexual contact" includes masturbation).

Finally, the defendant's objection to PSR ¶ 30 must also be overruled. The defendant

---

[7] The defendant was convicted following a trial by jury. Minor A is not a "complaining witness."

claims, without citation to authority, that "use of a computer" is already contained as an element of the offense and that the offense does not involve any "live" transmissions of sexually explicit conduct. Both facets of this undeveloped argument are wrong. Cell phones are "computers" and, as Probation notes, Kik is an "interactive computer service." *See United States v. Turner*, 756 Fed.App'x. 576 (6th Cir. 2018) (unpublished) (citing 18 U.S.C. § 1030(e)(1) in defining a phone as a computer and 47 U.S.C. § 230(f)(2) in defining Facebook as an interactive computer service). Furthermore, "use of a computer" is *not* an element of the offense – it happens that, in this case, the defendant's use of Kik on his phone to sexually exploit Minor A and to transfer obscene material to her comprised evidence of the interstate nexus. *See* 18 U.S.C. §§ 2251(a) and 1470; Doc. 268 at 87-89. Finally, the enhancement applies when a defendant uses a computer either to produce sexually explicit material *or* to transmit the material live. Application of the enhancement is appropriate.

### III.     Restitution and Fines

Minor A is not seeking restitution.

Here, imposition of the $5,000 JVTA Assessment pursuant to 18 U.S.C. § 3014 may well be appropriate, where the defendant is represented by retained counsel. *See United States v. Procell*, 31 F.4th 32, 37-38 (1st Cir. 2022) (no clear error in district court's ordering § 3014 assessment applicable to "non-indigent" defendants where Procell had a bachelor's degree, earned $59,000 prior to his arrest, had a supportive family willing to house him on his release, and had years of earning potential, despite fact that conviction for sex offense would not allow him to resume career as teacher post-release). The defendant bears the burden of proving indigence in this context. *United States v. Kelley*, 861 F.3d 790, 800 and n.5 (8th Cir. 2017). He has not done so.

IV.     **Application of the Section 3553(a) Factors**

For the reasons outlined herein, and those to be articulated at the sentencing hearing, the government submits that its recommended sentence is reasonable, and necessary in this case, to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and to protect the public. The government understands that the Guidelines sentencing ranges for child exploitation crimes in general – and the GSR for this defendant, in particular – are quite high as compared to the ranges for many other crimes that are prosecuted in federal court. That distinction is not without reason: both Congress, in setting the mandatory minimum sentence of incarceration applicable to the defendant's offense of conviction, and the Sentencing Commission, in developing the Guideline and specific offense characteristics applicable to his conduct, clearly recognize that individuals who prey on the most vulnerable members of our society merit truly significant punishment that is commensurate with the harm they cause and the danger they pose.

It is difficult to overstate the seriousness of the defendant's crimes. His conduct is beyond abhorrent; he targeted a 13-year-old middle schooler who professed her love for him, called him "Daddy," and did whatever he wanted her to. The imbalance in their "relationship" is almost as jarring as the exceedingly graphic content he sent her (masturbating to ejaculation, simulating sex with his bathroom sink) and obtained from her: while he praises her for her compliance with his demands, instructs her to help him cum, and unabashedly gloats over her "tight teen pussy," she sends him pictures of her coloring project and repeatedly tells him about her upcoming track meet. The point in their conversation where the defendant seemed to hesitate – asking her to remind him how old she was after she sent the "shading" picture that read "I love you Daddy" – was just that: a hesitation. *See* Exh. 21-3 at 18-19. The defendant forged ahead, ultimately pivoting back to the reason for his connection with Minor A when, the next day, he directed her to send him pictures

14

of her vagina while she was at a motel with her family.  He either could not control himself or he chose not to.  In either instance, his continued exploitation of the child on the other side of his screen demonstrates the danger that he poses to the public.

The defendant's culpability is compounded by his abuse of his position of public trust.  Not only was he entrusted by the state judiciary with overseeing the reformation of individuals charged with and convicted of "violent, outrageous, despicable, and disturbing behavior," Def. Memo. At 6, but he was also charged with the oversight of *other* probation officers who were responsible for such individuals.  The defendant was an Assistant Chief Probation Officer in one of the busiest courts in the Commonwealth.[8]  He committed this crime – which is, in itself, outrageous, despicable, and disturbing – while he was living with his family: his wife, his teenage daughter, and his teenage son (who was just a couple of years older than the victim when he got caught), all while he held this position of public authority and trust as an arm of the court.  And no one knew what he was doing behind the gianninyny username and avatar.  The fact that there were no red flags that *should* have triggered heightened scrutiny by those who knew and loved him or those who encountered him professionally is the problem here.  If the people closest to the defendant were not keyed in to the predatory nature of his relationship with Minor A, how can this Court expect any other person to see through his non-threatening, functional public and private persona once he is released?  Furthermore, the defendant has demonstrated no insight into why he did this, or really, expressed any indication of remorse for his offense.  To be clear, the government agrees that significant mental health / behavioral therapy and oversight is a necessary component of the term of supervised release, and that the defendant would be well-served by taking advantage of

---

[8]  See Massachusetts Trial Court, Year-End Case Filings | Tableau Public (last accessed July 27, 2022).

whatever programming is available to him while he is incarcerated.  In order to accomplish all the goals of sentencing, however, the defendant *must* be sentenced to a truly significant term of imprisonment.

What is also certain is that this is not a case that merits the imposition of the minimum possible sentence.  The fact that the defendant did not sexually abuse Minor A or follow up on his casual inquiry about when he could come see her are not mitigating here.  If the defendant *had* crossed those lines, he would be facing different consequences.  The sentence proposed by the government takes into account such parity considerations.  In § 2251 cases where defendants have committed hands-on abuse of their victims, judges in this district routinely impose sentences much higher than the one sought here.  *See*, *e.g.*, *United States v. Derek Sheehan*, No. 18-CR-10391-RGS, (defendant who produced child pornography involving his sexual assault of three minors sentenced to 45 years); *United States v. Decarolis*, 19-cr-40038-TSH (defendant who produced child pornography involving five minors sentenced to 38 years); *United States v. Lee*, 18-cr-10105-IT (defendant who used messaging application to direct New Hampshire male to produce specific child pornography depicting sexual abuse of child known to that person sentenced to 20 years after prompt plea; defendant who sexually abused the child in producing the material sentenced to 50 years in D.N.H. in 18-cr-00004-LM); *United States v. Anthony DeOrdio*, 18-cr-30056-MGM (defendant who created child pornography depicting sexual abuse of child known to him after having been previously convicted of a child pornography offense sentenced to 50 years); *United States v. Jonathan Monson*, 18-cr-30015-MGM (defendant who created child pornography depicting sexual abuse of child known to him sentenced to 40 years); *United States v. Toronto*, 17-cr-10307-FDS (defendant who produced child pornography depicting sexual abuse of two minor victims sentenced to 40 years); *United States v. Germaine*, 17-cr-30010-ADB (defendant who created child pornography depicting sexual abuse of child known to him when he was 25 years old

sentenced to 35 years pursuant to plea agreement); *United States v. Jason Gendron*, 13-cr-30036-WGY (defendant who created child pornography depicting sexual abuse of four children in his care sentenced to 50 years pursuant to plea agreement contemplating range of 40-50 years).

There is no reason to believe that anything but a lengthy term in prison will deter this defendant and others from committing similar offenses in the future. Regardless of what led the defendant to target and exploit the victim in this case, the harm perpetrated on her is the same. And, to be clear, that harm is extremely difficult to quantify. Similarly, the fact that the defendant comes before this Court with no prior record is not a mitigating factor in the context of these offenses. The defendant's record was taken into consideration in the calculation of his criminal history category. *See*, *e.g.*, *United States v. Oberg*, 877 F.3d 261 (7th Cir. 2017) (district judge properly noted that defendants in child pornography cases often have limited criminal histories).

The government recognizes that it is difficult to quantify exactly how many years would satisfy the Court's obligation to impose a sentence that is just, that would adequately deter both this defendant and others who might commit the same type of crime, and that would protect the most vulnerable members of our society. Ultimately, this Court can be confident that a Guidelines sentence will achieve all of these goals of sentencing.

## CONCLUSION

For the foregoing reasons, along with those to be outlined at the sentencing hearing, the government respectfully recommends that this Court impose a sentence of 329 months in prison

and a period of five years of supervised release. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

|  |  |  |
|---|---|---|
|  |  | Respectfully Submitted, |
|  |  | RACHAEL S. ROLLINS<br>United States Attorney |
| Dated: July 27, 2022 | By: | */s/ Anne Paruti*<br>Anne Paruti<br>Adam W. Deitch<br>Assistant United States Attorneys<br>One Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3100 |

## **CERTIFICATE OF SERVICE**

      I, Anne Paruti, hereby certify that the foregoing was filed through the Electronic Court filing system and will be sent electronically to the registered participant as identified on the Notice of Electronic filing:

Date: July 27, 2022                              /s/ Anne Paruti  
                                                 Anne Paruti  
                                                 Assistant United States Attorney