UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
    Plaintiff,                     )
                                   )
        v.                         )   Cr. No. 19-10010-MLW
                                   )
BRIAN ORLANDELLA,                  )
    Defendant.                     )

MEMORANDUM AND ORDER

WOLF, D.J.                                        December 22, 2022

At a March 10, 2020 hearing, the court decided and denied defendant Brian Orlandella's motions to suppress, and explained the reasons for its decisions. On March 12, 2020, the court entered an Order denying those motions. See Dkt. No. 113. This Memorandum is based upon the transcript of the decisions rendered orally on March 10, 2020. It adds citations, revises some of the discussion, and deletes certain non-essential matters. The transcript of the March 10, 2020 hearing is Docket No. 170.

I.   SUMMARY

Orlandella has moved to suppress: (i) statements he made to law enforcement on December 3, 2018 (Dkt. No. 39); (ii) evidence seized that day during a warrantless search of his automobile (Dkt. No. 60); and (iii) evidence seized that day pursuant to a search warrant (Dkt. No. 57). For the reasons explained below, the court is denying Orlandella's Motions.

II.  MOTION TO SUPPRESS STATEMENTS MADE ON DECEMBER 3, 2018

Orlandella has moved to suppress statements he made on December 3, 2018 at his home in Beverly, Massachusetts. He alleges that those statements were taken in violation of his Miranda rights. That motion is being denied.

The court finds that the defendant was in custody at the time the statements were made. Therefore, pursuant to the standards discussed by this court in United States v. Gonzalez, 719 F. Supp. 2d 167 (D. Mass. 2010)(citing cases), which the parties agree apply, the government has been required to prove by a preponderance of the evidence: (1) that the advice of rights required by Miranda v. Arizona, 384 U.S. 436, 479 (1966) were given; (2) that the defendant understood those rights; and (3) that the defendant knowingly, intelligently and voluntarily waived those rights before making the statements he seeks to suppress. Gonzalez, 719 F. Supp. 2d 170-74.

The court heard testimony and argument concerning this motion on March 2 and 3, 2020. Two Department of Homeland Security agents, Andrew Kelleher and Joseph Iannaccone, testified, the defendant's wife testified, and the defendant himself testified.

The burden of proof has been on the government to prove by a preponderance of the evidence facts that demonstrate that the government did not violate the defendant's Miranda rights. The government has done so.

2

In reaching this conclusion, the court has considered the direct and the circumstantial evidence. The court has also judged the credibility of the witnesses in the manner the court instructs juries to judge credibility. Among other things, the court considered whether the testimony and evidence were corroborated or contradicted by other evidence. The court considered whether a witness had a motive to lie. The court considered the demeanor of each of the witnesses. The court considered whether what the witness said was reasonable. Although the court will not usually single out particular untruthful statements, the court finds that the defendant's affidavit and testimony were not truthful in certain respects.

As indicated earlier, the court finds the defendant was in custody when questioned in his home on December 3, 2018. The standards for determining whether a defendant was in custody for Miranda purposes were summarized by the First Circuit in United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007), a decision with a number of analogies to this case. In Mittel-Carey, the First Circuit wrote:

> The constitutional requirement of Miranda warnings is well-traveled legal ground. "[A] person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first" receive Miranda warnings. Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

The "ultimate inquiry" when determining whether a
defendant was in custody during an interrogation "is
simply whether there was a formal arrest or restraint on
freedom of movement of the degree associated with a
formal arrest." Id. (quotation omitted); see also
Fernandez-Ventura, 132 F.3d at 846. This inquiry is
informed by considering the "totality of the
circumstances," id., and asking whether in light of the
circumstances of the interrogation, "a reasonable person
[would] have felt he or she was not at liberty to
terminate the interrogation and leave," Thompson, 516
U.S. at 112, 116 S.Ct. 457.

Though by no means an exhaustive list, this circuit has
identified four factors which ought to be considered
when custody is at issue, including "whether the suspect
was questioned in familiar or at least neutral
surroundings, the number of law enforcement officers
present at the scene, the degree of physical restraint
placed upon the suspect, and the duration and character
of the interrogation." United States v. Masse, 816 F.2d
805, 809 (1st Cir. 1987) (quoting United States v.
Streifel, 781 F.2d 953, 961 n. 13 (1st Cir. 1986)).

Id. at 39.

In this case, at 6:00 a.m. on December 3, 2018, a SWAT team

of about 12 officers carrying rifles broke down the defendant's

door and took him outside for about 15 to 20 minutes. He was

handcuffed and guarded while he was outside. The government

acknowledges that while outside his apartment, he was in custody.

The defendant was then taken back into his apartment. He was

told that he was not under arrest and that he was not in custody.

He was not told that he was free to leave. In fact, he was not

free to leave. There were armed officers with him at all times,

although their firearms were holstered and not visible. Those

officers were usually Kelleher and Iannaccone, the agents who

4

questioned the defendant. There were also about eight or nine other officers searching the house. The defendant was not allowed to move within his apartment without an escort. The defendant was not allowed to speak with his wife. The defendant was not allowed to take his son to school. The defendant was not allowed to go to work.

At about 7:15 a.m., the defendant said he wanted to call his office and asked what time he should tell them he would be coming to work, and then asked whether he should tell them "Never." See Dkt. No. 101-1 at page 21. Agent Kelleher responded, "I honestly don't know. I would say, I mean at least another hour before we're done here." Id.

In these circumstances a reasonable person would have believed that he was not at liberty to leave, which is the test, or part of the test, stated by the Supreme Court in Thompson v. Keohane, 516 U.S. 99 (1995). Id. at 112; see also Mittel-Carey, 493 F.3d at 39 (discussing the Thompson test).

As the court finds that the defendant was in custody, he was entitled to the protections of Miranda. As it wrote in Gonzalez:

> The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." To make this right meaningful, the Supreme Court has held that, prior to a custodial interrogation, law enforcement officials must inform the individual to be interrogated that: (1) he has the right to remain silent; (2) his statements may be used against him at trial; (3) he has a right to an attorney during questioning; and (4) if he cannot afford an attorney,

5

one will be appointed to represent him. See Miranda, 384 U.S. at 479, 86 S.Ct. 1602; see also Dickerson v. United States, 530 U.S. 428, 438-440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). An individual may knowingly, intelligently and voluntarily waive these rights and answer questions without an attorney. See Miranda, 384 U.S. at 479, 86 S.Ct. 1602; see also Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010). However, unless the government demonstrates that the required warnings have been given and have been knowingly, intelligently and voluntarily waived, its use of any statements obtained and, in some circumstances, evidence derived from those statements, is curtailed. See Patane, 542 U.S. at 644, 124 S.Ct. 2620; Miranda, 384 U.S. at 444, 86 S.Ct. 1602.

Id. at 170-71.

The court finds that the defendant was given his Miranda rights and he understood them. On December 3, 2018, the defendant was 42 years old. He had been a criminal justice major in college. Although the defendant did not admit it, the court finds that he took a course in criminal procedure. The defendant's answer on that issue was equivocal. In any event, the court finds that, as a criminal justice major, the defendant took a course in criminal procedure that would have included some discussion of Miranda.

As of December 3, 2018, the defendant had been a probation officer for 20 years. He had been the assistant chief probation officer in the Lynn District Court for 18 years. He worked with criminal defendants and he worked in the Lynn District Court. The defendant did not, as a probation officer, administer Miranda rights. However, by training and experience he was more familiar with Miranda rights than the average individual. The defendant had

6

also seen <u>Miranda</u> rights administered on television, although that
is not material to the court's analysis.

The defendant spoke with two agents, Kelleher and Iannaccone.
Except when the defendant asked that the recording be turned off
or when the agents took a break on a second occasion, the
discussion was tape-recorded. Despite the shock of being taken
into custody by armed officers at 6:00 a.m., the tape indicates
that the defendant was calm when he was speaking with Kelleher and
Iannaccone. Indeed, at times he joked with the officers, for
example, while making small talk with Kelleher about the difference
between the South Shore and the North Shore of Boston. <u>See</u> Dkt.
No. 101-1 at 1-2.

The officers were polite during approximately 48-minute
interview. The tape was stopped two times, including one time at
the defendant's request. The total time from the start of the first
taped session to the end of the third taped session was about 90
minutes - from about 6:28 to 7:58 a.m.

The demeanor of the officers, the court finds based on the
testimony, did not change when the recorder was turned off. The
court finds that they were polite and not threatening throughout.
The defendant was brought in and initially placed in the living
room, accompanied by another officer. He was then moved from the
living room to the kitchen. Iannaccone went to his vehicle to get

a form with the Miranda rights on it. While he was gone, Kelleher

and the defendant had the following conversation:

> Kelleher:      It's part of our process. The next thing
> we do is - No one is under arrest, no one, no one's in
> custody. You don't have to speak with us, but we do want
> to read you your Miranda rights so you understand what
> your rights are. So we have, we have a form that, you
> know I can read it to you, you can read it yourself and
> then, if you're so inclined, then we can sign it.
>
> Orlandella:    Okay.
>
> Kelleher:      He's just going to go grab one of those forms,
> so.
>
> Orlandella:    Okay.
>
> Kelleher:      We'll just do that before we start. And, you
> know, even if you decide you want to sign that and you want
> to stop at any time. That's what we'll do.
>
> Orlandella:    Mm-hmm.

Id. at 1.

After polite, somewhat jocular small talk about living in

Beverly as opposed to the South Shore, id. at 1-2, Iannaccone

returned with the form and the following colloquy occurred:

> Iannaccone:    Alright so I'm sure Andy mentioned you're
> not under arrest right now, okay. We're just interested
> in talking to you.
>
> Kelleher:      Would you like me to read this out loud
> or do you want to read it to yourself?
>
> Orlandella:    No, I know what it is.
>
> Kelleher:      Okay, great.
>
> Orlandella:    Can I use your pen Sir?
>
> Iannaccone:    Oh yes, yup. Here you go.

Kelleher:        And I think it's obvious but do you, you
read and write English well, I would assume.

Orlandella:      Mhmm.

Kelleher:        Haha, I just have to ask you that.

Id. at 2-3. Then the transcript and the tape reflect the sound of
a pen moving across paper. Id. at 3. Kelleher says, "It's the
third, December third. Let's witness this" and the pen is heard
moving across the paper. See id.

The court finds that the defendant had the form for about 13
seconds before he signed it or finished signing it. He looked at
the form, but it has not been proven that he read it carefully.
However, the court finds he looked at it carefully enough to see
that the form stated on separate lines each of the Miranda rights
with which he was familiar and included a statement that he was
waiving those rights. See Dkt. No. 66-1. The defendant's testimony
that he believed he was signing a consent to record form is not
credible.

The fact that the defendant was not read his Miranda rights
does not mean that he was not adequately advised of them. As the
First Circuit wrote in United States v. Van Dusen, 431 F.2d 1278
(1st Cir. 1970), "To require the agents to read the form aloud in
every such situation would seem both to discourage use of a printed
form and to mechanize a ritual without necessarily communicating
more understanding." Id. at 1280. Similarly, the Fourth Circuit,

in <u>United States v. Sledge</u>, 546 F.2d 1120 (4th Cir. 1977), essentially reached the same conclusion that <u>Miranda</u> rights do not have to be read to a defendant and cited several circuits that agree. <u>Id.</u> at 1122 ("We agree with the First, Third, Ninth, and Tenth Circuits that it is not essential that the warnings required by <u>Miranda</u> . . . must be given in oral rather than written form.").

The agents did not ask if the defendant understood his <u>Miranda</u> rights. It would have been better if they had done so. However, the defendant's conduct and comments persuade the court that he did understand his <u>Miranda</u> rights. The agents had told the defendant he could stop speaking at any time. At one point, the defendant asked the agents to stop recording their conversation, and they did. The court infers that defendant also knew that he could stop talking to the agents completely.

The court also concludes that the defendant understood that he had a right to an attorney. First, he knew this from his education and from his experience working in a courthouse for 20 years. In addition, before being told that he was being arrested, the defendant called his office. He credibly testified that in making that call he was hoping to get from a colleague the telephone numbers of two attorneys. <u>See</u> March 3, 2020 Tr. at 118:6-9.

The defendant did not, however, ask to call an attorney or to stop talking until he spoke to an attorney. Although the defendant

10

may now consider his decisions to waive his _Miranda_ rights and
speak to the agents unwise, he did not fail to stop answering
questions and call an attorney because he did not understand that
he could do both. He did understand.

Although not material to the court's analysis, the conclusion
that the defendant understood his _Miranda_ rights is reinforced by
the degree of knowledge the defendant displayed concerning the
legal definition of child pornography. More specifically,
Iannaccone asked the defendant, "What's your definition of child
pornography if you were to define it? What would you say child
pornography is?" Dkt. No. 101-1 at 28. Orlandella said, "Being in
possession of, knowingly being in possession of obscene, I'm using
the word obscene because I forgot the real definition of it,
photographs of someone underage." _Id._

The court also find that the defendant voluntarily
relinquished his _Miranda_ rights. More specifically, his decision
to talk to the agents was a product of a free and deliberate choice
rather than intimidation, coercion or deception, the standard
articulated by the Supreme Court in _Moran v. Burbine_, 475 U.S. 412
(1986). _Id._ at 421; _see also_ _Gonzalez_, 719 F. Supp. 2d at 171
(stating the _Moran_ standard).

As explained earlier, while Kelleher and Iannaccone were
armed, their weapons were not visible. Their tone in the taped
interview was always polite. They never threatened the defendant.

11

The defendant was interviewed in his home. When he asked for water, he was allowed to get it. When the defendant asked that the taping stop to discuss a sensitive subject, the agents accommodated his request.

The agents did not immediately tell the defendant they were investigating crimes related to child pornography or child exploitation. However, they did not give the defendant any misleading information about what they were investigating.

At one point Kelleher did say that they were not taping the discussion. However, Iannaccone had started the tape again. The court finds, however, that the defendant would not have behaved differently if he knew the tape was being restarted. He knew he was being taped in the first segment before he asked that the tape recording be turned off. He also knew he was being taped in the third segment after the agents said they wanted to take a break. This contributes to the court's conclusion that the fact that Kelleher had inaccurately stated that they were not taping for a period of time had no effect on Orlandella.

In any event, even after the agents told the defendant they were investigating his possible unlawful contact in communications with a minor, he continued to respond to their questions. See Dkt. No. 101-1 at 8-28. The taped part of the interview was about 48 minutes, and the agents were at the defendant's home for about a total of two hours.

12

In view of the foregoing, the court finds by a preponderance of the evidence that the defendant was in custody, the defendant was advised of his <u>Miranda</u> rights, the defendant understood his <u>Miranda</u> rights, the defendant waived his <u>Miranda</u> rights knowingly and voluntarily, and the defendant's waiver was made with full awareness of the nature of the rights being relinquished and the consequences of waiving them. Therefore, the motion to suppress the statements he made on December 3, 2018 is being denied.

### III. MOTION TO SUPPRESS EVIDENCE FROM WARRANTLESS SEARCH OF AUTOMOBILE

With regard to the second motion, the defendant has moved to suppress a hat found in a warrantless search of his automobile. He claims that his consent to the search was unlawfully coerced because agents said they were in the process of getting a warrant, or would get a warrant, and it would be easier and go faster if he consented. The defendant claims he was anxious to get to work and therefore he acquiesced.

Iannaccone and Kelleher denied telling the defendant they were in the process of getting a warrant or that they would get a warrant. The court finds the agents are credible on this issue and the defendant is not. The court also finds that, even if the agents mentioned a warrant in an unrecorded conversation, they did not say they were in the process of getting a warrant. In general, the

court finds the agents testified truthfully to the best of their memories.

Assuming without finding, because the court does not find, that the agents said they would get a warrant, the defendant's consent to the search was valid under the standards described in United States v. Vazquez, 724 F.3d 15 (1st Cir. 2013), where the First Circuit wrote:

> The Fourth Amendment forbids law enforcement from searching a suspect's home without a warrant unless the search falls under "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Consent to the search is one such exception. See id.
>
> For consent to a search to be valid, however, the government must prove by a preponderance of the evidence that the consent was uncoerced. See United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008). The presence of coercion is a question of fact based on the totality of the circumstances, including "the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place." United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (citing Schneckloth, 412 U.S. at 227, 229, 247, 93 S.Ct. 2041). Importantly, courts must also consider "any evidence that law enforcement officers' ... misrepresentation prompted defendant's acquiescence to the search." Vanvliet, 542 F.3d at 264-65 (citing Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

Id. at 18-19. In Vazquez, The First Circuit went on to say that where a defendant is told that there will be a search of his home

without consent, "reasonableness, rather than subjective good faith, is the controlling legal standard; consent procured by a claim that a search will ensue anyhow is valid only if the claim is based on a reasonable assessment of the facts under the applicable law." Id. at 19.

The government has proven by a preponderance of the evidence that the defendant's consent to search his car was not coerced. As described earlier in denying the motion to suppress the defendant's statements, the defendant understood that he did not have to speak to the agents and voluntarily agreed to do so. The court finds that the corollary of this is that the defendant knew he did not have to consent to a search of his car.

As also described earlier, the agents did not employ inherently coercive tactics to obtain the defendant's consent. The interview of the defendant was in his home. The recorded conversations demonstrate that the agents were always polite. As the transcript, reflects, Iannaccone said to the defendant, "Sir, do you have a car?" Dkt. No. 101-1 at 18. The defendant responded, "Yeah." Id. Iannaccone said, "Do you um" and the defendant interrupted and said, "Do you want to go through it?" Id. Iannaccone said, "Yeah, would you mind?" Id. Kelleher then added that the defendant was being "very cooperative" but they had to follow, in effect, established procedures and he gave the defendant the consent form to sign, which the defendant did sign. See id.

15

The defendant's contention that during the first break in the taping the agents said they were in the process of getting a warrant or, as the defendant testified on March 3, 2020 that they would get a warrant, is not credible. See March 3, 2020 Tr. at 145:10-19, 154:19-34. The break between the first and second taped segments of the interview was only eight minutes, from 6:38 a.m. to 6:46 a.m.[1] The break was to discuss a sensitive subject that the defendant did not want recorded.

Before offering to allow the agents to search his automobile, the defendant did not know he was again being recorded. The defendant asked if he was being recorded. Dkt. No. 101-1 at 10. Kelleher said, "No, yeah we're not recording." Id. However, Iannaccone had started the recording again and did not correct Kelleher. The court listened to the most pertinent part of the discussion, in which the defendant asked whether the agents wanted to go through his car. The defendant was calm and cooperative when he offered to allow a search of his automobile. If a warrant had been mentioned earlier, the defendant had no reason not to reference it.

As indicated earlier, the agents did misrepresent whether that part of the conversation was being recorded. However, the court finds that the defendant did not know he was then being

---

[1]    The 6:46 number can be obtained by using some of the numbers in the second segment that was taped.

recorded, and the fact of recording did not influence his actions. Kelleher's inaccurate statement did not influence Orlandella's consent to the search.

The defendant recalls discussion of the keys to the car when not being recorded. If this occurred, it was during the second break after he had consented to the search. After he consented, Kelleher said "Yeah, let me just get the keys. . ." Dkt. No. 101-1 at 20. He did that so he could give them to the other agents who would conduct the search. That was shortly after 7:04 a.m., and the taping of that second segment stopped at 7:09 a.m., five minutes later. See id. at 22. It is, therefore, likely that any discussion of the keys happened after the taping stopped and Kelleher got the keys and perhaps, as the defendant recalls, asked which was for his car.

The court finds that the defendant was hoping to be allowed to go to work rather than to be arrested that day. This may have influenced him to be cooperative and offer to allow the agents to search his car. However, the agents did not do anything to exploit that state of mind in obtaining consent to the search. The defendant probably offered to allow the search because he did not expect it would result in the discovery of any evidence.

After the search of the automobile, the agents showed the defendant a hat and a blue bracelet that were similar to items in the pictures that had been sent to the phone of the alleged victim,

"Minor A." The defendant asked, "Where did you find that? I think I lost that." Id. at 26. It is not clear whether he was talking about the hat or the bracelet. Kelleher said, "these were in your vehicle." Id. This was mistaken. The bracelet was found in the defendant's bedroom. However, the colloquy indicates that the defendant did not expect any evidence to be found in the car and, therefore, he had incentive to voluntarily consent to its search.

As indicated earlier, the court finds that the agents did not say they were in the process of getting a warrant or that they would get a warrant. If they mentioned a warrant during the first break, they would only have said they would get one, meaning they would seek one. They did not lie, the court finds, and say they were in the process of getting a warrant. Although the court does not find that they said they would get a warrant, if they had said that, it would not have rendered the defendant's consent invalid.

Iannaccone's Affidavit supporting the application to search the house stated that consumers of child pornography often maintain digital or electronic collections of child pornography in their vehicles, among other places. Aff. of Special Agent Joseph Iannaccone in Supp. of an Appl. for a Search Warrant ("Warrant Affidavit") at 10. In a footnote, the Warrant Affidavit referenced another pending case in which a computer with child pornography was found in the trunk of a vehicle. Id. at 10 n.13.

The court finds that since the Magistrate Judge issued the search warrant for the home, he also would have found probable cause and issued a warrant for the vehicle if he had been asked even based on the original application. However, by the time the defendant consented, the government had additional, relevant information that could have been included in a new affidavit for a search warrant. More specifically, though not material to the court's analysis, by the time he consented to the search of his vehicle, the defendant had admitted he had used a Kik messenger account like the account used to communicate with Minor A in this case. See Dkt. No. 101-1 at 12-13. He also said it was possible that he exchanged pictures with other people. In addition, he did not deny talking to someone who was 14 years old, as one of the agents said the defendant's chat logs indicated.

Therefore, any claim that the agents would get a warrant would have been based on a reasonable assessment of the facts under the applicable law at the time of the first break and reinforced by information they obtained before the defendant's consent. Therefore, the defendant's consent would have been valid. See Vazquez, 724 F.3d at 19. Accordingly, the motion to suppress the hat found in the vehicle is being denied.

IV.  MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A SEARCH
     WARRANT

For the reasons described below, the motion to suppress evidence seized pursuant to the search warrant, which defendant alleges was constitutionally deficient, is also being denied.

The basic issue is whether there was probable cause to believe that the search of defendant's home and the seizure of particular items would produce evidence of criminal activity. Probable cause means reasonable cause to believe. It is not required that the government show that it was more likely than not that evidence of criminal activity would be discovered. See United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979).

In addition, the court must review the Magistrate Judge's decision concerning probable cause with deference. The court has to decide whether there was a substantial basis for the Magistrate Judge to conclude that there was probable cause. It is not the court's role to decide if the court believe he was right. See Illinois v. Gates, 462 U.S. 213, 238-39 (1983); see also United States v. Joubert, 778 F.3d 247, 251-52 (1st Cir. 2015); United States v. Cordero-Rosario, 786 F.3d 64, 69 (1st Cir. 2015).

The defendant, in his motion to suppress, challenged the assertion that the Magistrate Judge had reviewed the allegedly pornographic images before issuing the search warrant. The defendant, now having more information, properly does not dispute

the fact that the Magistrate Judge reviewed those images. There is substantial evidence to prove that he did. The Magistrate Judge signed the application under oath, and it states that he reviewed the images. Warrant Affidavit at 16. Iannaccone's affidavit states that he gave the Magistrate Judge the images before the warrant issued. The court believes Iannaccone testified similarly.

Iannaccone provided the Warrant Affidavit, in which he wrote:

> I have been employed as a Special Agent at the U.S. Department of Homeland Security, Homeland Security Investigations ("HIS") since 2009, and am currently assigned to the office of the Special Agent in Charge, Boston, MA. While employed by HSI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography. I have gained experience through training and everyday work related to these types of investigations. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 1470, 2251, 2252A, and 2422, and I am authorized by law to request a search warrant.

Warrant Affidavit at 1. To the extent that the statements in Iannaccone's Warrant Affidavit relied on his training and experience, it was proper for the Magistrate Judge to rely on them. In United States v. Soto, 799 F.3d 68 (1st. Cir. 2015), the First Circuit wrote in reviewing one of this court's decisions, "we have time and again 'endorsed the concept that a law enforcement officer's training and experience may yield insights that support

21

a probable cause determination.'" Id. at 85 (quoting United States
v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014)). Iannaccone relied on
his training and experience in making many statements in support
of the contention that there was probable cause for the issuance
of the search warrant. It was proper for the Magistrate Judge to
rely on them. See id.

Defendant argues that the information in the application was
stale because it was four to six months old. However, the
Magistrate Judge was presented with this issue in the Warrant
Affidavit where Iannaccone stated:

> Consumers of child pornography almost always possess and
> maintain their "hard copies" of child pornographic
> material, that is, their pictures, films, video tapes,
> magazines, negatives, photographs, correspondence,
> mailing lists, books, tape recordings, etc., in the
> privacy and security of their home or some other secure
> location. Individuals who have a sexual interest in
> children or images of children often retain pictures,
> films, photographs, negatives, magazines,
> correspondence, books, tape recordings, mailing lists,
> child erotica, and videotapes for many years.

Warrant Affidavit at 9-10. Further, in a footnote to that
statement, the Warrant Affidavit included the following citation:

> See United States v. Morales-Aldahondo, 524 F.3d 115,
> 117-119 (1st Cir. 2008) (3-year delay between last
> download and warrant application not too long, given
> affiant testimony that consumers of child pornography
> value collections and thus often retain them for a period
> of time, and consumers who use computers to access child
> pornography are likely to use computers to store their
> collections).

Id. at 10 n.12. In Morales-Aldahondo, the First Circuit did indeed write that:

> Here, Morales argues that the passage of more than three years from the acquisition of the evidence until the warrant application rendered the evidence stale, and thus precluded a legitimate finding of probable cause by reducing the likelihood that the "evidence of the offense will be found at the place to be searched." Woodbury, 511 F.3d at 97. When evaluating a claim of staleness, we do not measure the timeliness of information simply by counting the number of days that have elapsed. United States v. Pierre, 484 F.3d 75, 83 (1st Cir. 2007). Instead, we must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information. Id.
>
> As earlier recounted, both the warrant application before the magistrate and the testimony presented to the district judge provided considerable support for the government's position that customers of child pornography sites do not quickly dispose of their cache. This is not a new revelation. See Ricciardelli, 998 F.2d at 12 n.4 ("[H]istory teaches that collectors prefer not to dispose of their dross, typically retaining obscene materials for years."). Accord, e.g., United States v. Irving, 452 F.3d 110 (2d Cir. 2006) (two years); United States v. Riccardi, 405 F.3d 852 (10th Cir. 2005) (five years).

Morales-Aldahondo, 524 F.3d at 119. Similarly, in McLellan, 792 F.3d 200 (1st Cir. 2015), the First Circuit wrote:

> It is important to take a moment to emphasize what McLellan is not arguing. He is not suggesting that the affidavit in support of the warrant was stale because it was unlikely he would have kept his illicit child pornography for more than two months. This argument would readily fail, as courts have held time and time again that child pornography traders and collectors maintain their collections for long periods of time, and often store it in safe, close, and easily accessible locations.

Id. 209 n.5. Although the information here was four to six months old, it was not stale in the sense of being unreliable for the purposes of determining probable cause. Although not argued orally, the fact the defendant was married does not alter this analysis.

In addition, there was a substantial basis to believe that the defendant would still have the phone, which was one object of the search warrant. In the application for the search warrant, Iannaccone informed the Magistrate Judge that, on July 30, 2018, Comcast had provided subscriber information for the IP address associated with the Kik service that was associated with the photos of the minor and videos of the minor at issue in this case. See Warrant Affidavit at 7. That address, Comcast advised, was associated with or subscribed to by Brian Orlandella, 34 Central Street, Apartment 2, Beverly, MA, and Comcast provided his phone number. Id.

The application for the search warrant was filed on November 30, 2018, four months later. It was reasonable for the Magistrate Judge to find that there was probable cause to believe the defendant still had the phone. A phone is not like drugs, which are frequently sold or disposed of. Drug dealers may frequently change their phones. However, it would have been reasonable for the Magistrate Judge to infer that the defendant did not frequently change his phone. And in fact, to the extent there was probable

24

cause to believe there was evidence of child exploitation or child pornography on the phone, the defendant had an incentive to keep it.

The court also finds that the warrant described the area to be searched and the items to be seized with the particularity required by the Fourth Amendment. The warrant authorized search for and seizure of computer hardware and other items associated with four crimes relating to child pornography or child exploitation. More specifically, the Search Warrant's Attachment B states, in part, under "DESCRIPTION OF INFORMATION TO BE SEIZED:"

> All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C., §§ 1470, 2251, 2252A, and 2422, including:
>
> A. Records and tangible objects pertaining to the following topics:
>
>    1. Child pornography and child erotica;
>
>    2. The transmission of obscene material to any minor; and
>
>    3. Communications with any other person that relates to the sexual exploitation of children.

Warrant Attach. B at USAO 0096 (formatting in original). Section IB of Attachment B authorizes the search and seizure of all records in whatever form and tangible objects that constitute evidence, fruits or instrumentalities of the same criminal statutes, including:

> B. For any computer hardware, computer software, computer-related documentation, or storage media

> called for by this warrant or that might contain
> things otherwise called for by this warrant ("the
> computer equipment"):
>
> 1. Evidence of who used, owned, or controlled the
>    computer equipment.

Id. (formatting in original). Computer hardware is defined to include smartphones and cellular phones, id. at USAO 0098, so the defendant's Motorola cell phone would constitute computer hardware under the terms of the warrant.

The warrant provided sufficiently specific descriptions of the items to be seized to guide and control the discretion of the executing agents. See United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999); United States v. Kuc, 737 F.3d 129, 133 (1st Cir. 2013); United States v. Bucuvalas, 970 F.2d 937, 941 n.5 (1st Cir. 1992). As the First Circuit wrote in Kuc:

> The particularity requirement demands that a valid
> warrant: (1) must supply enough information to guide and
> control the executing agent's judgment in selecting
> where to search and what to seize, and (2) cannot be too
> broad in the sense that it includes items that should
> not be seized.

Kuc, 737 F.3d at 133 (citing Upham, 168 F.3d at 535). In Kuc, the First Circuit held that "[d]espite Kuc's assertions to the contrary, however, the warrant in this case did not run afoul of the particularity requirement." Id. The same is true in the instant case. In Bucuvalas, the First Circuit upheld a warrant authorizing "the seizure of '[r]ecords, documents, notes and physical objects which constitute evidence of and instrumentalities of [four

26

specified crimes], and, in particular, records, documents, notes and physical objects [evidencing specified criminal acts by the suspect].'" Id. (citing Bucuvalas, 970 F.2d at 941 n.5). In Kuc, the First Circuit upheld a warrant that used the words "including, without limitation" rather than "in particular." Id.

In the instant case, the warrant permitted the seizure of records and tangible objects that constitute evidence of four specified crimes, including records and tangible objects pertaining to the transmission of obscene material to a minor. This language is similar to the language found to be constitutionally sufficient in Bucuvalas and Kuc.

The phone seized was associated with the Kik account of the person exchanging videos and pictures with Minor A. The blue bracelet is evidence that that person was the defendant. The language in the warrant sufficiently guided and controlled the agents, and they properly seized the phone, the bracelet, and anything else that they seized, such as pictures.

In addition, significantly, and it would have been permissible to start here, assuming without finding that the warrant was deficient, the good faith exception to the exclusionary rule applies. The good faith exception to the exclusionary rule is discussed by the First Circuit in, among other places, United States v. Levin, 874 F.3d 316 (1st Cir. 2017). The First Circuit said, in part:

Under the exclusionary rule, courts may suppress evidence "obtained as a direct result of an illegal search or seizure" as well as evidence that is the "fruit of the poisonous tree." . . . However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. (internal citations and quotation marks omitted).

The Supreme Court has clearly delineated the bounds of the good faith exception. Suppression remains appropriate:

1. "[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."

2. "[W]here the issuing magistrate wholly abandoned his judicial role."

3. Where the executing officer relies "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Leon, 468 U.S. at 923, 104 S.Ct. 3405 (citations omitted).

Furthermore, "[t]he Leon good faith exception does not apply where . . . a warrant . . . is 'so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid.'" United States v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007) (citing United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999)).

Id. at 322.

None of the exceptions to the good faith exception to the exclusionary rule apply here. This case is comparable to Kuc. In that case, the First Circuit wrote:

> [E]ven if we were to find that the language in this case
> exceeded the bounds of Bucuvalas and violated the
> particularity requirement of the Fourth Amendment,
> suppression still would not be necessary pursuant to the
> good faith exception to the exclusionary rule. This is
> because—as the district court correctly noted — the
> warrant, read comprehensively and in context, was not so
> "facially deficient . . . that the executing officers
> [could not] reasonably presume it to be valid." United
> States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82
> L.Ed.2d 677 (1984). Given our holding in Bucuvalas, we
> cannot conclude that "a reasonably well-trained officer
> would have known that the search was illegal despite the
> magistrate's authorization." Id. at 922 n.23, 104 S.Ct.
> 3405. Thus, the good faith exception to the exclusionary
> rule would apply.

Kuc, 737 F.3d at 134. This is equally true in the instant case.

Therefore, the motion to suppress based on alleged deficiencies in

the warrant and the process of obtaining the warrant is being

denied.

V.   ORDER

In view of the foregoing, it is hereby ORDERED that

Orlandella's motions to suppress (Dkt. Nos. 39, 57, 60) are DENIED.


UNITED STATES DISTRICT JUDGE